J-S44005-25                    2026 PA Super 156

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
  :
v.   :
  :
  :
  :
MICHAEL ALLEN STARK   :
  :
Appellant   :   No. 1648 EDA 2025

Appeal from the Judgment of Sentence Entered September 9, 2024
In the Court of Common Pleas of Bucks County Criminal Division at
No(s):  CP-09-CR-0003952-2023

BEFORE:  LAZARUS, P.J., DUBOW, J., and SULLIVAN, J.

OPINION BY LAZARUS, P.J.:                    **FILED JULY 22, 2026**

Michael Allen Stark appeals, *nunc pro tunc*,[1] from the judgment of sentence, entered in the Court of Common Pleas of Bucks County, following his convictions of one count each of first-degree murder,[2] second-degree murder,[3] robbery—inflict serious bodily injury,[4] robbery—threaten serious

---

[1] Prior to the instant appeal, Stark had filed an appeal to this Court, which was quashed as untimely.  **See** Order, 4/25/25.  On May 5, 2025, Stark filed a petition pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546, seeking reinstatement of his right to file a direct appeal, *nunc pro tunc*.  The PCRA court appointed counsel and, ultimately, the Commonwealth agreed that Stark's appellate rights should be reinstated.  On June 9, 2025, the PCRA court granted Stark's PCRA petition and reinstated his appellate rights *nunc pro tunc*.  This appeal follows.

[2] 18 Pa.C.S.A. § 2502(a).

[3] **Id.** at § 2502(b).

[4] **Id.** at § 3701(a)(1)(i).

bodily injury,[5] kidnapping,[6] flight to avoid apprehension,[7] criminal use of a communication facility,[8] tamper with/fabricate physical evidence,[9] and abuse of a corpse,[10] and three counts of theft by unlawful taking.[11] After careful review, we vacate Stark's judgment of sentence and remand for a new trial.

The facts of this case, while complex, are largely uncontested. Stark and Matthew Branning worked together at Enchlor, Inc. (Enchlor), a parts manufacturing business located in Silverdale Borough, Bucks County. Thane Tagg is the owner and operator of Enchlor. Stark worked at Enchlor beginning in May 2021 and worked part-time evening shifts, from 4:00 p.m. to 12:00 a.m., on weekends.[12] Branning was an employee at Enchlor for approximately nine years and worked the day shift from 8:00 a.m. to 4:00 p.m. every weekday. It is uncontested that Stark and Branning had no personal

---

[5] *Id.* at § 3701(a)(1)(ii).

[6] *Id.* at § 2901(a)(2).

[7] *Id.* at § 5126(a).

[8] *Id.* at § 7512(a).

[9] *Id.* at § 4910(1).

[10] *Id.* at § 5510.

[11] *Id.* at § 3921(a).

[12] We note that Stark also worked part-time at Fetterolf Corporation but had been failing to appear for work since September 2021.

J-S44005-25

relationship, rarely saw each other at work due to their separate shifts, and spoke only sparingly about work.

In October 2021, Stark was having difficulty showing up to work. In particular, October 5, 2021 was the last day Stark had appeared for a scheduled shift. Additionally, on October 7, 2021, Stark was having car issues, and Branning, at Tagg's behest, picked up Stark and brought him to work. However, shortly after arriving at Enchlor, Branning took Stark home. Later, Stark informed Tagg that he would also be able to work on October 15, 2021 and wished to discuss the possibility of increasing his hours and transitioning to full-time employment.

On October 15, 2021, Branning and Tagg arrived at work at approximately 8:00 a.m. and 9:00 a.m., respectively. At approximately 2:00 p.m., Tagg left Enchlor and asked Branning to notify him when Stark arrived. Tagg received no update from Branning and, at 4:30 p.m., returned to Enchlor to find the business empty. Tagg, believing Branning had left for the day and that Stark's failure to appear was an indication that Stark had voluntarily chosen to end his employment, locked the building and went home.

On October 16, 2021, Branning's family reported him missing to the Bucks County police. Specifically, they explained that Branning had not come home from work after his shift on October 15 and had missed several scheduled family events on the evening of October 15 and the morning of October 16. On October 19, 2021, Stark's family reported Stark missing because they had not heard from him in several days.

- 3 -

On October 17, 2021, Detective Travis Schoonover of the Perkasie Borough Police Department was assigned to investigate Branning's disappearance. Through the course of his investigation, he acquired the help of Detective David Hanks of the Bucks County Detectives Bureau,[13] who specialized in cell tower data. Police were able to create a timeline of both men's movements using records gathered from Uber, license plate readers on toll booths provided by the New Jersey Turnpike Commission, cell tower data, and Branning's bank transactions.

Based upon their investigation, police discovered that, on October 15, 2021, Stark took an Uber from his residence, located at 314 Walnut Street Royersford, Bucks County, to Enchlor. Approximately three miles before he arrived at Enchlor, Stark shut off his cell phone. Stark's Uber arrived at Enchlor at 3:38 p.m. Stark's arrival was confirmed by Uber records, the Uber driver, and a Ring Doorbell camera from a house across the street from Enchlor that depicted the Uber vehicle arriving at Enchlor. At 4:07 p.m., Branning was shown in drive-thru ATM security camera footage at a BB&T Bank (BB&T), located in Sellersville, Bucks County, where he withdrew $500.00. Branning was shown driving his 2002 Silver Lexus SUV at the time of the transaction, wearing a black colored t-shirt and white colored shorts. A second figure can be seen moving in the backseat of the Lexus, but it is

---

[13] Detective Hanks retired prior to the jury trial in this case but was admitted as an expert in cell tower data. **See** N.T. Jury Trial (Day 3), 9/5/24, 138-41 (Detective Hanks admitted as expert in field of historical cell site analysis).

impossible to discern any features of the person due to the window tinting and glare.[14]

After the ATM withdrawal, cell tower data located Branning's phone at approximately 4:47 p.m., traveling northbound over the Scudder Falls Bridge from Pennsylvania into New Jersey. Shortly after crossing into New Jersey, Branning's phone ceased communicating with cell towers. Later that evening, at 7:05 p.m., a debit card transaction was recorded on Branning's BB&T bank account at a gas station in Somers Point, New Jersey.[15] This was the final transaction recorded on Branning's BB&T bank account.

At 8:36 p.m., Branning's Lexus was seen on toll booth license plate readers traveling southbound on the Garden State Parkway in New Jersey. The Lexus entered the parkway from the Somers Point exit. At 9:04 p.m., both Stark's and Branning's cell phones began transmitting again in Cape May, New Jersey. Both phones pinged a cell tower near a Wawa store in Cape May (Cape May Wawa). Surveillance footage from the Cape May Wawa depicted an individual, later identified as Stark, entering the store wearing glasses and

_____

[14] **See** N.T. Jury Trial (Day 1), 9/3/24, at 21-25 (Detective Schoonover summarizing BB&T video); **see also** Commonwealth Exhibit C-10 (BB&T video); Commonwealth Exhibit C-11 (BB&T video zoomed in); Commonwealth Exhibit C-12 (alternate angle BB&T surveillance video); Commonwealth Exhibit C-13 (alternate angle BB&T surveillance video zoomed in).

[15] We note that, in New Jersey, gas station attendants pump gas for the driver and drivers are prohibited by law from pumping their own gas. Additionally, by the time the police discovered that Branning's vehicle had stopped there, the gas station had already overwritten its security camera backups and there was no recoverable video footage. **See** N.T. Jury Trial (Day 2), 9/4/24, at 26-28.

a dark-colored sweatshirt with the hood pulled over his head. Stark purchased two USB adapter car charger cables, one compatible with his phone and the other compatible with Branning's phone. Branning is not seen on the Cape May Wawa footage.

At 10:14 p.m., Branning's vehicle was depicted traveling northbound on the Garden State Parkway through the Cape May Toll Plaza. At 10:28 p.m., Branning's phone communicated with a cell tower north of the Great Egg Toll Plaza and traveled north towards the Atlantic City Expressway. This was the last transmission from Branning's phone as it did not turn back on and was never located.

At 10:42 p.m., the Lexus is depicted traveling westbound on the Atlantic City Expressway towards Philadelphia. On October 16, 2021, from 12:09 a.m. until 1:52 a.m., Stark's phone pinged off cell towers in McPherson Square in the Kensington section of Philadelphia. This is the last recorded activity from Stark's cell phone, which, like Branning's, was never located. Ultimately, the investigation revealed[16] that Stark moved to Detroit, Michigan and was listed as being employed by a temporary employment agency, People Ready, as of October 27, 2021.

_____

[16] Investigators became aware of Stark's location in November of 2021, when Stark pawned a bicycle at Garden City Pawn, a pawn shop in Garden City, Michigan. **See** N.T. Jury Trial (Day 2), 9/4/24, at 48-49; **see also** Commonwealth Exhibit C-26 (Garden City Pawn pawn slip). Police secured receipts and surveillance footage, which depicted Stark entering Garden City Pawn with a bicycle. **See** Commonwealth Exhibits C-27, C-28 (photographs of Stark entering Garden City Pawn); Commonwealth Exhibits C-29, C-30 (surveillance videos of Stark entering Garden City Pawn).

On November 2, 2021, 17 days after Stark and Branning disappeared, a couple walking their dog in Reisterstown, Maryland found a deceased individual (John Doe)[17] in a drainage ditch off the side of a service road on the 13000 block of Old Hanover Road.[18] The drainage ditch had seen at least some rainfall during the preceding weeks and, as a result, the body had sustained water damage. Maryland police and EMS responded and determined that John Doe was deceased. John Doe was wearing a black colored t-shirt and white shorts.

John Doe was transported to the Maryland Office of the Chief Medical Examiner (OCME) in Baltimore, Maryland. On November 3, 2021, Jiemin Zhou, M.D., an associate pathologist (Dr. Zhou), Stephanie Dean, M.D., a forensic pathologist and the Chief Medical Examiner of OCME (Dr. Dean), and William Ceasor Rodriguez, III, Ph.D., a consulting forensic anthropologist (Dr. Rodriguez), conducted the autopsy.[19] As discussed *infra*, Dr. Rodriguez assisted the OCME in determining time of death.

_____

[17] This John Doe would later be identified as Branning. However, the body would not be identified as Branning until April 2022, and this lapse in time is particularly relevant to the facts of this case. Thus, we refer to the body as "John Doe" until he is identified as Branning during the police investigation.

[18] Maryland authorities were not able to identify the John Doe due to the facial deterioration and water damaged hands, which, respectively, prevented facial recognition and fingerprinting. Thus, they did not contact Pennsylvania or Bucks County authorities.

[19] Doctors Dean and Rodriguez were accepted as experts in their respective fields and testified at trial as to their opinions and conclusions. *See* N.T. Jury
*(Footnote Continued Next Page)*

Doctor Dean concluded, in relevant part, that John Doe's body was in the early stages of decomposition. Doctor Dean concluded that the body had not sustained any gunshot wounds, puncture wounds, or fractured bones, did not exhibit any evidence of blunt-force trauma or car-related injuries, and that John Doe's neck was largely intact and exhibited no visible injuries from ligature. As a result of these conclusions, Dr. Dean also performed radiology, microscopic autopsy, dissection, and toxicology tests.[20] These tests revealed only that one of John Doe's coronary arteries was 50% occluded; however, Dr. Dean concluded that this was not likely a cause of death but could contribute to an arrythmia, which would not have been detectable by the tests she performed. Additionally, the toxicology test revealed a small amount of ethanol was present, which Dr. Dean concluded was due to the stage of decomposition.

Doctor Dean further opined that an autopsy, at this stage of decomposition, would not be able to rule out death by seizure, cardiac arrythmia, asphyxia, exposure to elements, drowning, or rare drugs or poisons. Ultimately, Dr. Dean concluded that the cause of death and manner of death were undetermined.

_____

Trial (Day 3), 9/5/24, at 14-15 (Doctor Dean admitted as expert in forensic pathology); *id.* at 43 (Doctor Rodriguez admitted as expert in forensic anthropology). Doctor Zhou did not testify at trial.

[20] The toxicology report was prepared and authored by Rebecca Phipps, who did not testify at trial. *See* Commonwealth Exhibit C-70 (OCME post-mortem examination report).

Doctor Rodriguez, who was also present at the autopsy, assisted Dr. Dean and, together, they collected various maggots from John Doe. Doctor Rodriguez opined that maggots can help determine time of death through a process called "time of colonization." Time of colonization refers to the time at which flies have inhabited a corpse and laid eggs. It does not necessarily coincide with the time of death. Based upon the recovered maggot corpses,[21] the environmental conditions of the drainage ditch, and the early decomposition stage of the body, Dr. Rodriguez concluded that John Doe had died within the last five days, or as early as October 29, 2021.

In December 2021,[22] Branning's vehicle was found abandoned in Falls Church, Virginia, without a license plate and with a flat rear left tire. Branning's family was alerted to its location when a towing company in Virginia sent a letter to them. Branning's family alerted Detectives Schoonover and Hanks, who communicated with the Fairfax County, Virginia police department.

_____

[21] As was noted several times throughout trial, Dr. Rodriguez is not a forensic entomologist. *See id.* at 47, 50, 57, 65, 72. Nevertheless, Dr. Rodriguez still opined that the maggots recovered were of the first or second instar and, thus, could not have been present in the body for more than five days. The term "instar" refers to "the stage of development of the blow fly. After they hatch they . . . go through three instars or stages of development[, during which] their morphology [] changes . . . and that's how one can determine whether [the larvae is a first, second, or third] instar." N.T. Jury Trial (Day 3), 9/5/24, at 63 (Doctor Rodriguez defining instar).

[22] The record does not reflect the exact date that Branning's vehicle was found.

The Fairfax County police confirmed that Branning's vehicle was locked, they had not seen anyone with the vehicle, and no one had entered the vehicle as part of the towing process. Fairfax County police also secured the vehicle in its impound lot and had not entered the vehicle.

Shortly thereafter, Detectives Schoonover and Hanks secured a search warrant for the vehicle and traveled to Falls Church, Virginia. During this search, the detectives obtained DNA swabs of the steering wheel, which revealed positive matches for Stark's DNA, but no match for Branning's DNA.[23] The detectives also located two packs of Newport cigarettes, empty crack cocaine containers, Branning's BB&T debit card, and a loose battery and back cover for Stark's cellphone. The Newport cigarettes were affixed with a New Jersey tax stamp, indicating that they were purchased in New Jersey. Stark was a known smoker whose brand of choice was Newport. Additionally, investigators noted that the driver's seat was adjusted almost entirely forward, nearly touching the steering wheel. Investigators believed that this seat position indicated that a person of smaller stature was the last to operate the vehicle. Notably, police believed Stark, who is 5'2", was the last operator of the vehicle.[24] Additionally, police recovered a USB drive, which was later

_____

[23] The detectives also swabbed various door handles, a cigarette, one of the empty Newport packs, and several vehicle surfaces.

[24] Shortly after discovering Branning's vehicle, the Commonwealth initiated Grand Jury proceedings against Stark. Stark was ultimately arrested and extradited to Pennsylvania, where he testified before the Twentieth Bucks

*(Footnote Continued Next Page)*

identified as Branning's, which contained music and "thousands" of images and videos of women asphyxiating men with their thighs. *See* N.T. Jury Trial (Day 2), 9/4/24, at 63-64; *see also* Pre-Trial Motions Hearing, 1/12/24, at 25-26 (describing contents of USB drive).

In February 2022, investigators intercepted phone calls between Stark and his family. The phone calls were centered around Stark's family's frustrations with being interviewed by the police about where Stark went, or what happened to Branning, and Stark responded, "I don't know, you shouldn't be talking about it, I have no idea." Commonwealth Exhibit C-44, at 2:49.

On April 4, 2023, the Doe Network, a non-profit organization that identifies missing persons and John Doe bodies,[25] performed dental record checks on the John Doe discovered in Maryland on November 2, 2021, and determined that John Doe's teeth matched Branning's dental records. Subsequent DNA testing confirmed that John Doe was Branning. As a result, the OCME transported Branning's body to Pennsylvania.

On August 8, 2023, the Bucks County District Attorney's Office contacted Dennis Cornelis Dirkmaat, Ph.D., a forensic anthropologist (Dr. Dirkmaat), and requested that he determine Branning's cause, manner,

---

County Investigating Grand Jury on January 13, 2022. On March 2, 2023, the Grand Jury concluded that there was sufficient evidence to charge Stark with the above-mentioned offenses.

[25] *See* https://www.doenetwork.org (last visited Feb. 24, 2026).

and/or time of death. The Bucks County District Attorney's Office sent Branning's body to Dr. Dirkmaat, who conducted a "comprehensive forensic anthropological analysis" that included forensic osteological analysis, inventory of the remains, biological profile analysis, antemortem skeletal trauma analysis, perimortem skeletal trauma analysis, forensic taphonomic analysis, and postmortem interval. *See* Commonwealth Exhibit C-73 (Doctor Dirkmaat's expert report). Doctor Dirkmaat, after reviewing Drs. Dean and Rodriguez's autopsy notes and conclusions, similarly concluded that the cause and manner of death were undetermined. However, Dr. Dirkmaat disagreed with Dr. Rodriguez's 5-day time-of-death window and, instead, opined that Branning had died within 21 days prior to the discovery of his body on November 2, 2021.[26]

On January 10, 2024, the Commonwealth sought a third opinion, from John Robert Wallace, Ph.D., a forensic entomologist (Dr. Wallace). In particular, the Commonwealth requested that Dr. Wallace assist in determining the postmortem interval, if possible, using the maggots that Drs. Dean and Rodriguez had recovered from Branning's body. *See* Commonwealth Exhibit C-74 (Doctor Wallace's expert report). The Commonwealth sent Dr. Wallace a flash drive that included: the homicide report, expert and autopsy reports from Drs. Dean and Rodriguez, and

_____

[26] Notably, this time-of-death window places Branning's earliest time of death on October 11, 2021, four days before he disappeared.

autopsy photographs. *See id.* Doctor Wallace explained that, typically, he does not estimate time of death but rather time of colonization. *See id.*

Doctor Wallace opined that, while time of colonization is not time of death, it can be used to help determine time of death. *See* N.T. Jury Trial (Day 4), 9/9/24, at 10. Doctor Wallace opined that time of colonization is impacted by various factors including, but not limited to, temperature ranges, amounts of rainfall,[27] and the position of the body. *See id.* (Doctor Wallace explaining fly wings cannot operate below 50 degrees Fahrenheit and, thus, struggle to colonize bodies at low temperatures); *see id.* at 11 (Doctor Wallace testifying flies cannot swim and, thus, rainfall data is important where body is recovered from ditch or body of water as flies would be unable to colonize submerged body); *see id.* (Doctor Wallace explaining colonization can be reset if sufficient rainfall submerges body orifices as it could drown or kill any flies or larvae).

Through the provided photos, Doctor Wallace identified maggots of first, second, and third instar. *See* Commonwealth Exhibit C-74 (Doctor Wallace's expert report); *see also* N.T. Jury Trial (Day 4), 9/9/24, at 18-19 (Doctor

_____

[27] Doctor Wallace testified that, based upon data from the Baltimore-Washington Airport (BWI), there was approximately 1.96 inches of rainfall on October 25, 2021, and 3.91 inches of rainfall on October 29, 2021. *See id.* at 20. Doctor Wallace explained that amount of rainfall could impact, or reset, time of colonization. *See id.* However, Dr. Wallace also testified that the Commonwealth did not provide him with rainfall data for the specific region where Branning's body was recovered and, thus, he could not sufficiently opine as to whether that rainfall had a significant impact on the time of colonization in this case. *See id.* at 21-22.

Wallace explaining there were not "very many" third instars). Doctor Wallace explained that, if Branning's body contained only first and second instars, then the time of colonization was between 8:54 a.m. on October 27, 2021, and 5:54 p.m. on October 29, 2021. *See* Commonwealth Exhibit C-74 (Doctor Wallace's expert report); *see also* N.T. Jury Trial (Day 4), 9/9/24, at 18-19. However, Dr. Wallace stated that the presence of third instar maggots was significant because it expands the time of colonization to between 9:54 a.m. on October 23, 2021, and 5:54 p.m. on October 29, 2021. *See* N.T. Jury Trial (Day 4), 9/9/24, at 18-19. In reaching his conclusions, Dr. Wallace explained that he was unable to accurately discern the type of blowfly[28] present because none of the maggot specimens were properly preserved and he only had access to photographs; thus, he was only able to give a "conservative" time of colonization estimate. *See id.* at 22-27. Ultimately, Dr. Wallace did not opine as to cause or manner of death.

_____

[28] Doctor Wallace testified that different species of blowfly have different rates at which they progress to third instar. *See id.* at 15-16. Doctor Wallace explained that, due to improper preservation of the maggots and the generally incomplete data, he was unable to discern the exact genus of blowfly. *See id.* at 14-17; *see also* Commonwealth Exhibit C-74 (Doctor Wallace's expert report). Thus, Dr. Wallace evaluated the maggots as though they were of the *Calliphora* or *Phormia* generas, as both of those genera of blowflies would have been active in that region of Maryland during October. *See* Commonwealth Exhibit C-74 (Doctor Wallace's expert report).

On March 12, 2024, Sarah Waldrip, a DNA analyst at Bode Technology (Analyst Waldrip),[29] testified as to the DNA samples collected from Branning's vehicle. **See** Commonwealth Exhibit, C-66 (Analyst Waldrip's expert report). Analyst Waldrip testified that the DNA samples from Branning's steering wheel matched Stark's DNA and specifically excluded Branning's DNA. **See id.**; **see also** N.T. Jury Trial (Day 2), 9/4/24, at 177-80. Analyst Waldrip stated that the DNA samples taken from the driver's side interior rear door handle, passenger rear, and empty Newport cigarette packs were all "below the limit of detection," which means they "did[ not] meet the threshold for Bode Technolog[y] to give a conclusion." N.T. Jury Trial (Day 2), 9/4/24, at 181-82. Further, the DNA sample taken from the driver's side front panel was consistent with Branning's DNA and excluded Stark's DNA. **See id.** at 182-83. Lastly, the DNA swab taken from the cigarette specifically excluded both Stark and Branning and, instead, comprised a DNA profile of an unknown male. **See id.** at 183.

As indicated above, Stark was arrested, extradited, and charged with the above-mentioned offenses. On December 21, 2023, the Commonwealth filed an omnibus pre-trial motion requesting, *inter alia*,[30] that it be permitted

_____

[29] Analyst Waldrip was admitted as an expert in DNA analysis. **See** N.T. Jury Trial (Day 2), 9/4/24, at 167.

[30] The Commonwealth also requested reciprocal discovery and that the defense be prohibited from admitting evidence from Branning's USB drive at trial. **See** Commonwealth's Omnibus Pre-Trial Motion, 12/21/23, at 1-7.

to present evidence of Stark's prior convictions of robbery under Pa.R.E. 404(b)(2) for the purposes of demonstrating motive, intent, plan, and/or opportunity consistent with those convictions. *See id.* at 1-2. On December 27, 2023, Stark filed an omnibus pre-trial motion, which included, *inter alia*,[31] requests to preclude admission of Stark's prior convictions for robbery as prior bad acts. *See id.* at 4-5.

On January 12, 2024, the trial court conducted a hearing on the parties' pre-trial motions. Relevant to the claims on appeal, the Commonwealth sought to introduce evidence under Rule 404(b)(2) of Stark's three prior convictions for robbery for the following events:[32] (1) On December 13, 1994, Stark was convicted of robbery for a March 15, 1993, robbery of a Taco Bell located in Allentown, Lehigh County, where Stark utilized a stolen .25 caliber automatic handgun, threatened an employee, and took the contents of the Taco Bell safe. Upon arrest, Stark was found to be in possession of cocaine; (2) On January 9, 1995, Stark was convicted of robbery for a February 25, 1993, robbery of a Domino's Pizza located in Lower Nazareth Township, Northampton County, where he brandished a chrome-plated pistol, put the handgun against the jaw of an employee, and took the contents of the

---

[31] Stark's omnibus pre-trial motion included requests for discovery, habeas corpus relief, expert reports, sequestration of Commonwealth witnesses, suppression, and production of transcripts. *See* Stark's Omnibus Pre-Trial Motion, 12/27/23, at 1-7 (unpaginated).

[32] For ease of reference, we refer to Stark's prior convictions, collectively, as Stark's 1990s robbery convictions.

Domino's safe. During this robbery, Stark and a co-defendant ordered three Domino's employees into a walk-in freezer; and, (3) On January 29, 1996, Stark was convicted of robbery for a March 11, 1993, robbery of a Pizza Hut located in Montgomery Township, Montgomery County, where Stark utilized a chrome handgun to threaten a Pizza Hut employee, took the money from the safe, and ordered the employee into the walk-in freezer. **See** N.T. Pre-Trial Hearing, 1/12/24, at 8-9 (Commonwealth summarizing Stark's 1990s robbery convictions); **see also** Trial Court Opinion, 7/18/25, at 14-15 (summarizing Stark's 1990s robbery convictions).[33]

On February 1, 2024, the trial court entered an order granting in part and denying in part pre-trial motions. Relevant to the issues on appeal, the trial court granted the Commonwealth's request to admit evidence of Stark's 1990s robbery convictions as prior bad acts under Rule 404(b) for the limited purposes of demonstrating motive, intent, plan, and/or opportunity and, consequently, denied Stark's motion to preclude them. **See** Omnibus Pre-Trial Order, 2/1/24, at 1-3.

Ultimately, on September 3, 2024, Stark proceeded to a four-day jury trial. Immediately prior to closing arguments, the Commonwealth presented Stark's 1990s robbery convictions, via Detective Schoonover's testimony, to the jury. **See** N.T. Jury Trial (Day 4), 9/9/24, at 37-48; **see also id.** at 37

---

[33] We observe that the trial court's opinion, authored on July 18, 2025, incorporates its prior opinion, dated February 26, 2025, as an attachment. We cite to the trial court opinion as dated July 18, 2025 throughout this opinion.

(Stark renewing objection to admission of his 1990s robbery convictions); *id.* 49-52 (Stark renewing Rule 404(b) objection to admission of his 1990s robbery convictions after Detective Schoonover's direct testimony); *id.* at 37, 52-53 (trial court overruling Stark's Rule 404(b) objections). On September 9, 2024, Stark was convicted of the above-mentioned offenses. Stark proceeded immediately to sentencing and the trial court imposed an aggregate sentence of life without the possibility of parole. Stark filed a timely post-sentence motion, which the trial court denied.

Stark filed a notice of appeal, *nunc pro tunc*, and a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Stark now raises the following claims for our review:

> 1. Did the trial court err by incorrectly permitting impermissible [Rule] 404(b) evidence during trial, specifically[ the 1990s robbery convictions.]
>
> 2. Did the trial court commit an error of law by denying [Stark]'s motion for a mistrial, in response to the Commonwealth presenting evidence that was prohibited by the trial court's pre-trial order?

Brief for Appellant, at 10 (unnecessary capitalization omitted).

Stark first argues that the trial court erred in admitting his 1990s robbery convictions as prior bad acts under Rule 404(b)(2) for purposes of demonstrating plan, motive, intent, and/or knowledge. *See id.* at 14-22. Stark contends that, despite the Commonwealth's statements to the contrary, the Commonwealth sought to admit his 1990s robbery convictions for the sole purpose of demonstrating that he is a dangerous person who commits armed

robberies. *See id.* at 14. Stark asserts that the prejudicial effect of this evidence outweighed any probative value because the lapse in time between his 1990s robbery convictions and the instant case is approximately 30 years, there are no factual commonalities between his 1990s robbery convictions and the instant case, and the trial court's jury instructions could not, and did not, remedy such prejudice. *See id.* at 15-22. We agree.

"Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." *Commonwealth v. Drumheller*, 808 A.2d 893, 904 (Pa. 2002). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will[,] or partiality, as shown by the evidence of record." *Commonwealth v. Harris*, 884 A.2d 920, 924 (Pa. Super. 2005). "It is not sufficient to persuade the appellate court that it might have reached a different conclusion[; rather,] it is necessary to show an actual abuse of the [trial court's] discretionary power." *Commonwealth v. Bryant*, 67 A.3d 716, 726 (Pa. 2013) (citation and quotation marks omitted).

Relevance is the threshold for admissibility of evidence. *Commonwealth v. Cook*, 952 A.2d 594, 612 (Pa. 2008). Pursuant to Pa.R.E. 401, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence[] and [] the fact is of consequence in determining the action." Pa.R.E. 401. "Evidence is relevant

if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable[,] or supports a reasonable inference or presumption regarding a material fact." **Drumheller**, 808 A.2d at 904. "All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. "The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

Pennsylvania Rule of Evidence 404(b) provides as follows:

**Rule 404. Character Evidence; Other Crimes, Wrongs, or Acts**

\* \* \*

**(b) Other Crimes, Wrongs or Acts.**

*(1) Prohibited Uses*. Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) *Permitted Uses*. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case[,] this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa.R.E. 404(b)(1)-(2).

Recently, our Supreme Court analyzed Rule 404(b)(2)'s "modus operandi" exception. **See Commonwealth v. Walker**, 350 A.3d 54, 73 (Pa.

2026) (explaining "common plan, scheme, or design . . . [are not] distinct exceptions[, but are used] interchangeably"). The Supreme Court explained that modus operandi is akin to a "virtual signature," and a mere "logical connection" between the crimes is insufficient to satisfy Rule 404(b)(2).[34] *See id.*

"**[E]vidence of prior crimes is not admissible for the sole purpose of demonstrating a criminal defendant's propensity to commit crimes**." *Commonwealth v. Melendez-Rodriguez*, 856 A.2d 1278, 1283 (Pa. Super. 2004) (emphasis added). Further, "[m]ere similarities between a defendant's prior bad acts and the crimes for which he is being tried will not qualify for a Rule 404(b)(2) exception." *Commonwealth v. Akhmedov*, 216 A.3d 307, 316 (Pa. Super. 2019) (citation omitted). Nevertheless, "[e]vidence may be admissible in certain circumstances where it is relevant for some other legitimate purpose and not utilized solely to blacken the defendant's character." *Melendez-Rodriguez*, 856 A.2d at 1283. Specifically, other crimes evidence is admissible if offered for a non-propensity purpose, such as proof of an actor's knowledge, plan, motive, or identity, or absence of mistake

_____

[34] Notably, in *Walker*, our Supreme Court analyzed this exception as it pertains to consolidation of trials but made clear that there was no distinction between case consolidation and application of Rule 404(b)(2) when determining the admissibility of prior convictions. *See id.* at 61-62 (explaining Pa.R.Crim.P. 582, governing consolidation, necessarily requires Rule 404(b) analysis to determine admissibility of other crimes in separate trials).

or accident. ***Commonwealth v. Chmiel***, 889 A.2d 501, 534 (Pa. 2005). When offered for a legitimate purpose, evidence of prior crimes is admissible if its probative value outweighs its potential for unfair prejudice. ***Commonwealth v. Hairston***, 84 A.3d 657, 664-65 (Pa. 2014).

Unfair prejudice "means a tendency to suggest decision on an improper basis or to divert the [fact-finder]'s attention away from its duty of weighing the evidence impartially." ***Commonwealth v. Dillon***, 925 A.2d 131, 141 (Pa. 2007).

> Evidence will not be prohibited merely because it is harmful to the defendant. This Court has stated that it is not required to sanitize the trial to eliminate all unpleasant facts from the [fact-finder]'s consideration where those facts **are relevant** to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged. Moreover, we have upheld the admission of other crimes evidence, when relevant, even where the details of the other crime[s] were extremely grotesque and highly prejudicial.

***Id.*** (emphasis added; internal citation and quotation marks omitted). "Additionally, when examining the potential for undue prejudice, a cautionary jury instruction may ameliorate the prejudicial effect of the proffered evidence. . . . Jurors are presumed to follow the trial court's instructions." ***Hairston***, 84 A.3d at 666. Thus, where a cautionary instruction is provided to the jury, the likelihood of undue prejudice is minimized. ***See id.***

Instantly, the trial court explained its ruling as follows:

> Stark was convicted [for his 1990s robbery convictions], respectively, [27], [26], and [25] years prior to the current charges. As a result of those crimes, Stark remained on parole and under the supervision of the [Commonwealth] until 2015, six

years prior to the murder of Branning. Although the lapse of time at issue in this case was lengthy, the [c]ourt maintains that evidence of Stark's prior criminal convictions is admissible and offered for a legitimate purpose.

The underlying facts of Stark's December 13, 1994 conviction are that on March 15, 1993, Stark entered a Taco Bell in Allentown, Lehigh County[,] brandishing a stolen firearm and directed an employee to open the safe and place money into a duffle bag. Stark was arrested and found to have stolen $637.79 in cash. He was also found to be in possession of cocaine.

Next, the underlying facts of Stark's January 9, 1995, conviction are that on February 25, 1993, Stark entered a Domino's Pizza in Northampton County, Pennsylvania, brandishing a firearm and demanded the employees open the safe and place the money into a bag[, a]fter which Stark placed the employees inside of a walk-in freezer before fleeing the premises. Stark was found to have stolen $885[.00] in cash.

Finally, the underlying facts of Stark's January 29, 1996, conviction are that on March 11, 1993, Stark entered a Pizza Hut in Montgomery County, Pennsylvania. Stark, at gunpoint, demanded that the employee open the safe and surrender the cash. Following this, Stark forced the employee into the walk-in freezer before fleeing the premises. Stark was found to have stolen $1,416[.00].

The evidence of prior bad acts was introduced in a very limited sense and was elicited through the testimony of Detective Schoonover. The Commonwealth recalled Detective Schoonover as a witness, prior to ending [its] case in chief, in which he read the corresponding affidavits of probable cause for each prior conviction. No further examination or discussion regarding these past convictions occurred.

First, we address the obvious gap in time between the prior acts and the current case . . . [and] conclude[] that the remoteness factor does not outweigh the other considerations at hand. Here, the prior convictions share striking similarities with the alleged crime, in terms of opportunity, method, intent, and motive. The pattern of conduct strongly suggests that Stark's actions were not accidental or the result of mistake, but instead an intentional and deliberate course of behavior. As a result, we found the evidence

to be highly probative and [that its probative value] outweighs any prejudicial impact resulting from the lapse of time.

In each of the three prior bad acts, Stark [] demonstrated a consistent pattern of behavior towards the victims. In all cases, Stark place[d] himself in a position of authority, using a forceful demeanor while remaining meticulous in his efforts to avoid drawing public attention. Stark's actions are clearly calculated and focus on obtaining small amounts of cash. In this case, while no evidence of a weapon was introduced, it was established that Stark was in the backseat of Branning's vehicle[,] likely coercing and directing Branning to withdraw money from the [BB&T ATM].

Ultimately, such evidence is probative of Stark's motive and intent to threaten Branning and restrict his freedom of movement as he did in the prior armed robberies when he forced employees of the establishments he robbed into the walk-in freezer before fleeing. The absence of a weapon does not diminish the significance of Stark's actions, which are critical to understanding the nature of his involvement in this incident. Furthermore, the prior acts illustrate that Stark was not mistaken, and his intentions were to rob Branning of money when he entered the vehicle, the same as his intentions were upon entering the three prior establishments.

[T]he [c]ourt did not err in determining that the probative value . . . outweighed any potential for unfair prejudice. . . . The [c]ourt emphasiz[ed] that Stark's prior armed robberies were not so dissimilar from the current charges of robbery and kidnapping that they would lead the jury to convict based solely on [Stark]'s bad character. Here, as previously established, Stark and Branning left Enchlor together that day. The prior convictions are directly relevant to critical issues regarding intent, motive[,] and plan. In addition to the similarity of Stark's conduct, such evidence is pivotal in helping the jury understand the context of the conduct charged.

Moreover, in evaluating the potential prejudicial impact of the evidence, the [c]ourt [found] that the prior bad acts in question are not particularly inflammatory or emotionally charged. The risk of undue prejudice is therefore *de minimis*. While the evidence may provide context and assist the jury in understanding Stark's actions, it does not, in this instance, pose a substantial risk of unfairly influencing the jury or overshadowing the primary issues in this case.

\* \* \*

Additionally, . . . to mitigate any potential for undue prejudice, directly after the affidavits of probable cause were introduced, the [c]ourt instructed the jury as follows:

> Ladies and gentlemen, you have just heard evidence tending to prove the defendant was involved in prior robberies for which he is not on trial here.  This evidence is before you for a limited purpose.  That is for the purpose of tending to show common motive, intent, plan[,] and/or opportunity.  This evidence must not be considered by you in any other way than for the purpose I just stated.
>
> You must not regard this evidence as showing that the defendant is a person of bad character or criminal tendencies from which you might be inclined to infer guilt.

N.T. [Jury Trial (Day 4),] 9/9/24, at [] 48.  The [c]ourt again instructed the jury . . . at the conclusion of trial:

> You have heard evidence tending to prove that the defendant was involved in prior robberies for which he is not on trial.  I speak to the testimony of Detective Schoonover to the effect that [] Stark was previously convicted of robbery in Montgomery County, . . . Lehigh County, . . . and Northampton County[.]  This evidence is before you for a limited purpose; that is, for the purpose of tending to show common motive, intent, plan[,] and/or opportunity.
>
> This evidence must not be considered by you in any way other than for the purpose I just stated.  You must not regard this evidence as showing that the defendant is a person of bad character or criminal tendencies from which you might be inclined to infer guilt.

*Id.* at 135.

Trial Court Opinion, 7/18/25, at 14-18.

Our review of the record does not support the trial court's determination that Stark's prior convictions are admissible to show modus operandi, intent,

- 25 -

motive, and/or opportunity. Rather, our review reveals that Stark's prior convictions are clearly distinguishable from, and have absolutely zero similarities to, the instant case. Simply put, there is no relevancy.

Stark's prior robbery convictions introduced as evidence by the Commonwealth can be summarized as follows: (1) Stark utilized a firearm to steal money from a Taco Bell; (2) Stark utilized a firearm to steal money from a Domino's Pizza; and (3) Stark utilized a firearm to steal money from a Pizza Hut. **See id.** at 14-15. In the Domino's Pizza and Pizza Hut robberies, Stark and a **co-defendant** forced the employees into walk-in freezers. **See id.**; **see also** N.T. Jury Trial (Day 4), 9/9/24, at 37-49 (Detective Schoonover testifying that in Domino's Pizza and Pizza Hut robberies, Stark had an accomplice and co-defendant). Simply put, Stark's prior robbery convictions all involved threatening, but not physically harming, restaurant employees with a firearm and demanding small sums of money from their safes. **See** Trial Court Opinion, 7/18/25, at 14-15; **see also** N.T. Jury Trial (Day 4), 9/9/24, at 37-49.

In the matter sub judice, there is no firearm, no evidence of robbery, no forcing of anyone into a walk-in freezer, no evidence of co-defendants, and Branning **died**. Stark did not kidnap anyone in his prior convictions and **did not kill anyone**. Furthermore, in Stark's 1990s robbery convictions he neither threatened employees nor crossed any state lines. Suffice it to the say there are **absolutely no commonalities between Stark's 1990s robbery convictions and the instant events**.

More specifically, we disagree with the trial court's conclusion that Stark's prior convictions fall within the ambit of the Rule 404(b)(2) exception. *See id.* at 14-18. We emphasize that these prior convictions are so devoid of similarities to the instant case that they simply cannot demonstrate plan, motive, opportunity, or intent.

As they are related to each other, Stark's 1990s robbery convictions reveal his modus operandi as utilizing a firearm and threats to rob a chain restaurant's safe for small amounts of cash. *See Walker*, *supra* at 73 (modus operandi is "virtual signature" and mere "logical connection" between crimes is insufficient to satisfy Rule 404(b)(2) exception). However, as noted above, the instant case is over 25 years removed from those prior cases, has no similarities to them, and, consequently, cannot be utilized to demonstrate Stark had a common plan, scheme, or design. *See id.* (explaining that "common plan, scheme, or design . . . [are not] distinct exceptions[, but are used] interchangeably"). Therefore, Stark's prior convictions do not satisfy the modus operandi exception set forth in Rule 404(b)(2). *See Melendez-Rodriguez*, *supra*; Pa.R.E. 404(b)(1).

Further, Stark's 1990s robbery convictions cannot satisfy the Rule 404(b)(2) exception demonstrating motive, opportunity, or intent. There are no commonalties between Stark's 1990s robbery convictions and the instant case. More importantly, there is nothing in the record that even tends to suggest that the instant offenses grew out of, or were in any way caused by, his 1990s robbery convictions. *See Commonwealth v. Martin*, 387 A.2d

835, 838 (Pa. 1978) (Rule 404(b)(2) "motive" exception requires Commonwealth demonstrate crime **currently on trial** "grew out of or was in any way caused by [] prior set of facts and circumstances").[35]  It is clear from the record that Branning's disappearance and death in no way grew out of or were caused by Stark's robberies of chain restaurants in the 1990s.  *See Commonwealth v. Ross*, 57 A.3d 85, 104 (Pa. Super. 2012) (reversing murder conviction because trial court had improperly admitted evidence of defendant's past violent abuse of women as proof of common scheme to rape and murder victim); *see also Commonwealth v. Green*, 271 A.3d 393, 404-05 (Pa. Super. 2021) (concluding prior shooting not sufficiently similar to establish identity despite similar locations of crimes where crimes occurred 14 months apart and utilized different firearms).  How these cases could be considered at all related to the instant matter is beyond the understanding of this Court, and the trial court made no effort to address Rule 404(b)(2)'s

---

[35] The Commonwealth claims, in its brief, "Stark [] killed Branning to hide his involvement in the [robbery of Branning] because [Stark] was the only actor with the opportunity or motive to do so."  Commonwealth's Brief, at 18.  The Commonwealth's argument is misplaced and not in line with *Martin*.

Here, in order for the Commonwealth to satisfy the motive exception, Stark's robbery and murder of Branning **would have had to arise out of Stark's robberies from the 1990s**.  *See Martin*, *supra*.  There is no evidence to support such a contention and the Commonwealth presents no argument that it does.  Rather, the Commonwealth contends that Stark was the only actor with the opportunity or motive to kill Branning.  *See* Commonwealth's Brief, at 18.  Yet, that claim falls short of Rule 404(b)(2)'s motive exception and, even if true, has no bearing on whether or not Stark's 1990s robbery convictions are admissible.

motive exception. As a result, we conclude that the trial court unequivocally abused its discretion and erred in allowing the Commonwealth to introduce Stark's prior convictions as evidence in the instant trial. *See Melendez-Rodriguez*, *supra*; Pa.R.E. 404(b)(1). For the same reasons, we conclude that Stark's 1990s robbery convictions were not admitted for a legitimate purpose, but, rather, to paint Stark as a violent person who uses guns to commit robberies. *See Hairston*, *supra*.

We likewise conclude that the trial court's jury instructions did not cure the undue prejudice. The jury instructions, quoted above, make clear that the jury was only to consider those convictions for the limited purposes of showing intent, motive, opportunity, or plan. *See* Trial Court Opinion, 7/18/25, at 18 (quoting jury instructions); *see also* Jury Trial (Day 4), 9/9/24, at 48 (first jury instruction); *see id.* at 148 (second jury instruction). However, as we have concluded that Stark's 1990s robbery convictions, by law, **were not admissible for those purposes**, it was inappropriate for the trial court, via its ruling and jury instructions, to permit the jury to consider Stark's 1990s robbery convictions **at all**. Consequently, we conclude that the jury instructions failed to ameliorate the undue prejudice caused by the admission of Stark's 1990s convictions.

In summation of our foregoing analysis, we conclude that the trial court abused its discretion when it improperly admitted evidence of Stark's robbery convictions from 1994, 1995, and 1996, respectively. *See Harris*, *supra*. Such evidence had no commonalities with the instant offenses and, as such,

failed to satisfy any of the exceptions set forth in Rule 404(b)(2). Further, the jury instructions failed to ameliorate the prejudice Stark suffered because the jury could not have considered the evidence for the limited purposes described by the trial court, constituting an error of law. We, therefore, are constrained to conclude that the evidence was offered for no legitimate purpose and, in any event, was more prejudicial than probative, and was offered for propensity purposes, rather than to demonstrate modus operandi, intent, motive, or opportunity. *See Dillon*, *supra*; *Melendez-Rodriguez*, *supra*.

The trial court's abuse of discretion, however, only justifies reversal if the error was not harmless. *See Commonwealth v. Hamlett*, 234 A.3d 486, 492 (Pa. 2020) (appellate courts may raise harmless error sua sponte).

Our Supreme Court has defined harmless error as follows:

> Although it is [] evident that error occurred, [an a]ppellant is not entitled to a new trial if the error was harmless. An error will be deemed harmless if: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Markman*, 916 A.2d 586, 603 (Pa. 2007) (citations and quotations omitted).

"The harmless error doctrine, as adopted in Pennsylvania, reflects the reality that the accused is entitled to a fair trial, not a perfect trial."

*Commonwealth v. Drummond*, 775 A.2d 849, 853 (Pa. Super. 2001). "[A]n error can be harmless only if the appellate court is convinced **beyond a reasonable doubt** that the error is harmless." *Commonwealth v. Story*, 383 A.2d 155, 162 (Pa. 1978) (emphasis added).

"If honest, fair[-]minded jurors might very well have brought in not guilty verdicts, an error cannot be harmless on the basis of overwhelming evidence." *Commonwealth v. Rasheed*, 640 A.2d 896, 898 (Pa. 1994) (citation and quotation marks omitted). Where a court determines that the evidence of guilt is overwhelming, the court must then "decide[] if the error was so insignificant by comparison that it could not have contributed to the verdict." *Id.* Our Supreme Court has cautioned that "a conclusion that the properly admitted evidence is so overwhelming and the prejudicial effect of the . . . error is so insignificant by comparison, that it is clear beyond a reasonable doubt that the error is harmless, is not to be arrived at lightly." *Story*, 383 A.2d at 166.

Instantly, the trial court addressed harmless error as follows:

The Commonwealth presented substantial and compelling evidence of Stark's guilt, including physical and forensic evidence placing Stark in Branning's vehicle, security footage of Stark in Cape May, New Jersey[,] traveling in the vehicle, and[,] most notably[,] the exact locations of Branning and Stark's phones through cell-site and GPS tracking. The jury's verdict reflects their careful consideration based on the overall weight of the evidence, rather than any influence from the prior convictions. Thus, any error that may have occurred in the admission of such evidence did not affect the outcome of the trial.

> Stark's prior conduct was not introduced to show that he ha[d] a propensity for criminal behavior, but rather to show that the conduct in question [wa]s consistent with Stark's modus operandi and to establish intent. The probative value of the evidence outweighs any potential prejudice to Stark, especially with the provision of a proper limiting instruction.

Trial Court Opinion, 7/18/25, at 18-19.

Based upon our review of the record, we conclude that the above-described error was not harmless and that Stark is entitled to a new trial. In reaching this conclusion we rely heavily on the fact that the Commonwealth conceded throughout this case that almost all of its evidence was circumstantial, that there is virtually no direct evidence identifying Stark as a kidnapper, robber, or murderer, and that there is no direct evidence that Branning was even murdered. *See* N.T. Jury Trial (Day 4), 9/9/24, at 103 (Commonwealth closing argument explaining most of its evidence was circumstantial); *see also* Commonwealth's Brief, at 20 ("Commonwealth's case-in-chief was, admittedly, mostly circumstantial").

We conclude that evidence of Stark's prior convictions could not be, and was not, merely cumulative of other untainted evidence presented at trial. ***See Markman***, ***supra***. Similarly, for the reasons stated above, we conclude that the prejudice Stark incurred was not "*de minimis*." The trial court's error in admitting Stark's prior convictions was, without doubt, prejudicial, as it cast Stark as someone who has repeatedly committed armed robbery. Such a prejudicial light had virtually no probative value in the instant case where the Commonwealth failed to present evidence that even a generically similar armed robbery occurred. We emphasize that the admission of Stark's 1990s

robbery convictions effectively told the jury a story that Stark was armed with a gun and threatened Branning. Without Stark's 1990s robbery convictions, the trial transcripts are entirely devoid of evidence that Stark employed any weaponry, let alone a firearm, or threatened Branning in any way.

Given our conclusion that this evidence was not cumulative, not *de minimis*, and, ultimately, was far more prejudicial than probative, we must ascertain whether the other evidence was so overwhelming and that the prejudicial effect was, thus, so insignificant by comparison that the trial court's error was harmless. ***See Markman***, ***supra***.

We conclude that the facts of this case are **not so overwhelming** that the trial court's admission of Stark's prior convictions were harmless. We reiterate and emphasize that, here, the Commonwealth's direct evidence demonstrated that Stark and Branning left Enchlor in the afternoon of October 15, 2021, and both men traveled to New Jersey, and then to the Kensington section of Philadelphia. Throughout this trip, there is no evidence that either of the two men communicated with anyone. That is the last shred of evidence regarding the activities or location of Stark or Branning until October 27, 2021 and November 2, 2021, respectively. That is 12 days and 17 days, respectively, before either of the men are seen again.

The Commonwealth presented almost no evidence that the men were together during that period of time, with the exception of the time they traveled together in New Jersey and Kensington. Seventeen days later, Branning's body was recovered in Maryland, and his vehicle was later located

in Virginia in December of 2021. The Commonwealth further demonstrated that, at least at some point between October 15, 2021, and October 27, 2021, Stark operated Branning's vehicle. *See* Commonwealth Exhibit C-66 (Stark's DNA present on steering wheel and other portions of vehicle). However, the Commonwealth presented no direct evidence as to how or when Branning's body made it to Maryland, whether he was alive or dead when he arrived in Maryland, or how or when Branning's vehicle made it to Virginia.[36] Again, we reiterate that the gap in time was 12 days from Stark's disappearance on October 15, 2021, until he was confirmed to be in Michigan on October 27, 2021. The time lapse is 17 days from Branning's disappearance until the recovery of his body on November 2, 2021, which was not identified until April 4, 2022. Finally, the time lapse pertaining to the discovery of Branning's vehicle is at least 45 days from October 15, 2021, when it was last seen on the New Jersey turnpike, until December 2021, when it was located and recovered in Falls Church, Virginia. Notably, there are at least 35 days between October 27, 2021 and December 2021, when it would have been virtually impossible for Stark to access the vehicle.

The above periods of time are wholly unaccounted for in the Commonwealth's evidence. Indeed, the Commonwealth presented no

_____

[36] The only possible connection of this case to Falls Church, Viginia that the Commonwealth found was that Branning had an ex-girlfriend who lived in Virginia Beach, Virginia. *See* N.T. Jury Trial (Day 2), 9/4/24, at 37 (Detective Schoonover testifying he interviewed Branning's ex-girlfriend, who stated she had not spoken to Branning since 2017).

evidence that Branning's vehicle could not have been accessed, stolen, or operated by someone else between October 15, 2021, and December of 2021. The Commonwealth simply had no idea where the vehicle was during that period or who may have operated it. In making these observations, we emphasize that Stark and Branning were not the only DNA sources found in the vehicle. *See* N.T. Jury Trial (Day 2), 9/4/24, at 183 (Analyst Waldrip testifying there was unidentified third male source of DNA on some items tested in vehicle).

Further, after Branning's body was discovered on November 2, 2011, and ultimately identified on April 4, 2022, there are no fewer than four different experts who examined the body, the maggots, and other conditions, including but not limited to, the rainfall, temperature, and position of the body. Two of these experts concluded that the **cause of death and manner of death are undetermined**. *See* N.T. Jury Trial (Day 3), 9/5/24, at 19-20 (Doctor Dean testifying cause and manner of death are undetermined); *see id.* at 39-75 (Doctor Rodriguez testifying solely regarding time of death); *see id.* at 102 (Doctor Dirkmaat testifying his examinations revealed no perimortem injury, cause of death, or manner of death); *see* N.T. Jury Trial (Day 4), 9/9/24, at 25 (Doctor Wallace testifying that he was not asked to determine cause or manner of death). **None of the experts can say how Branning died**. Not only can none of the experts explain how Branning died,

but the investigators also never located a murder weapon or evidence of one.[37]

Finally, none of the experts could even conclude that there was a homicide in this case.

Because we cannot say with any degree of certainty that there was even a homicide, let alone that the other offenses were committed, we conclude that there is not overwhelming evidence to sustain Stark's convictions.

---

[37] We note, as we did above, that three of the experts opine different times of death. Doctor Rodriguez testified that Branning died within 5 days of November 2, 2021, which would have made it impossible for Stark to kill Branning because Stark was already in Michigan at that time. Doctor Dirkmaat testified that Branning died sometime between October 11, 2021, and November 2, 2021. Doctor Dirkmaat was not aware that his timeline overlapped with when Branning was confirmed to still be alive by at least four days. **See** N.T. Jury Trial (Day 3), 9/5/24, at 104 (Doctor Dirkmaat testifying that in estimating postmortem interval, he did not realize that his three-week estimate overlapped when Branning was alive by four days). Finally, Dr. Wallace, testified that he estimated **time of colonization** to be between 9:54 a.m. on October 23, 2021, and 5:54 p.m. on October 29, 2021. **See** N.T. Jury Trial (Day 4), 9/9/24, at 18-19. Doctor Wallace explained that time of colonization can happen almost immediately or could be delayed, or even reset, by a number of environmental factors that he had insufficient data to account for. **See id.**

In any event, taking the evidence in the light most favorable to the Commonwealth, as we must, we are unable to resolve these discrepancies. Even if we discount all expert opinion regarding a timeline that would either exonerate Stark or make the Commonwealth's case implausible, **the expert testimony still fails to illuminate how Branning died**. Again, none of the experts could explain Branning's cause or manner of death. There are no direct witnesses, there are no detectable injuries to Branning's body, and the Commonwealth's evidence that there was even a murder is entirely circumstantial, even speculative. In short, even assuming, arguendo, that Branning died sometime between the evening of October 15, 2021, when he and Stark disappeared, and October 27, 2021, when Stark was confirmed to be in Michigan, there is simply not overwhelming evidence to demonstrate that Stark killed Branning.

Accordingly, the trial court's error cannot be and is not harmless and we are compelled to vacate Stark's convictions and remand for a new trial consistent with this opinion.[38]

Judgment of sentence vacated. Case remanded for a new trial. Jurisdiction relinquished.

Dubow, J., Joins the Opinion.

Sullivan, J., Files a Concurring Statement.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/22/2026

---

[38] In light of our disposition, we need not address Stark's remaining claim. However, we note that it is somewhat intertwined with the above-discussed Rule 404(b) prior bad acts claim. In particular, during Detective Schoonover's testimony, wherein he presented the jury with Stark's 1990s robbery convictions, he also referenced a prior arrest of Stark for which he had not been convicted and that the trial court had previously ruled was inadmissible. *See* N.T. Jury Trial (Day 4), 9/9/24, at 49-53 (Stark's Rule 404(b) objection and discussion of trial court's prior ruling). Nevertheless, we need not address whether this was error.